**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:20-cr-0039 |
| ) | |
| **ROMEO WALTER, KENAN THOMAS,** ) | |
| **NIJOHNTEA WALKER,** ) | |
| ) | |
| Defendants. ) | |
| ) | |

**ATTORNEYS:**

**KYLE PAYNE, ESQ.**
**ADAM SLEEPER, ESQ.**
UNITED STATES ATTORNEY'S OFFICE
ST THOMAS, U.S. VIRGIN ISLANDS
   FOR THE UNITED STATES OF AMERICA

**KIA D. SEARS, ESQ.**
ASSISTANT FEDERAL DEFENDER
ST THOMAS, U.S. VIRGIN ISLANDS
   FOR DEFENDANT KENAN THOMAS

**LORENZO J. PALOMARES STARBUCK, ESQ.**
PALOMARES-STARBUCK & ASSOCIATES
MIAMI, FLORIDA
   FOR DEFENDANT ROMEO WALTER

**CARL WILLIAMS, ESQ.**
SMITH WILLIAMS, PLLC
ST. THOMAS, U.S. VIRGIN ISLANDS
   FOR DEFENDANT NIJOHNTEA WALKER

## MEMORANDUM OPINION

**MOLLOY, Chief Judge.**

  **BEFORE THE COURT** are the following motions: Defendant Kenan Thomas' ("Thomas") Motion to Dismiss Counts 2-9 under the Second Amendment, filed on September

28, 2022 (ECF No. 179); and Defendant Romeo Walter's ("Walter") Motion to Dismiss Counts 5, 6, 7, 8, 9 of the Indictment and Motion Adopting Codefendant Motion to Dismiss, filed on September 29, 20222 (ECF No. 180.) The United States of America ("the Government") opposed the motions. (ECF No. 189.) Thomas filed a reply in which he indicated that he joins and adopts the arguments in Walter's motion to dismiss. (ECF No. 193.) For the following reasons, the Court will deny the motions.

## I. BACKGROUND

A grand jury indicted Thomas and Walter (collectively "Defendants") with nine counts of firearms laws violations. (ECF No. 12.) On November 9, 2022, the Government moved to dismiss several counts from the Indictment. On December 6, 2022, the Court granted the Government's motion and dismissed Counts Five, Eight, and Nine against Thomas and Walter and Counts Five, Six, Seven, Eight and Nine against Defendant Nijohntea Walker. (ECF No. 192.) The remaining counts against Walter and Thomas—the subject of the instant motions—are Count One and Two, felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), Count Three and Seven, possession of a firearm with an obliterated serial number in violation of 18 U.S.C. §§ 922(k), 924(a)(1)(B) and 2 and 23 V.I.C. § 481(b), Count Four, possession of a firearm in a school zone in violation of 18 U.S.C. §§ 922(q), 924(a)(1)(B) and 2, and Count Six, unauthorized possession of a firearm in violation of 14 V.I.C. § 2253(a). Thomas and Walter make facial challenges to these statutes in light of the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

## II. LEGAL STANDARD

The Second Amendment to the U.S. Constitution provides that "[a] well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Bruen*, the Supreme Court clarified the framework courts must use to analyze Second Amendment challenges while also reaffirming *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010), in which the Court "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-

defense." *Bruen*, 142 S. Ct. at 2122. The Supreme Court rejected the two-step approach that the Courts of Appeals had developed to assess the Second Amendment claims, finding that step one, "which demands a test rooted in the Second Amendment's text, as informed by history," is consistent with *Heller*, but step two, which involves "means-end scrutiny," is not supported by *Heller* and *McDonald*. *Id*. at 2127. *Bruen* held "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home," *id.* at 2122, and the following standard applies to the Second Amendment challenges:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126.

### III. DISCUSSION

Defendants argue that the Second Amendment's plain text protects their conduct, which was not prohibited by the colonial and founding-era laws. The Government argues that the Second Amendment does not protect felons and the prohibition statutes at issue are constitutionally sound.

### A. Section 922(g)(1) - Felon in Possession of a Firearm

Section 922(g)(1) prohibits any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" from possessing a firearm. 18 U.S.C. § 922(g)(1). Since "the right secured by the Second Amendment is not unlimited," the Supreme Court in *Heller* reaffirmed "longstanding prohibitions on the possession of firearms by felons" and "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. *Bruen* confirmed the validity of *Heller* in no uncertain terms, including its explanation that the Second Amendment "'elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). In

keeping with *Heller*, the Supreme Court held that New York's public-carry licensing requirement that "an applicant demonstrates a special need for self-defense" violates the Constitution "in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Bruen*, 142 S. Ct. at 2122, 2156.

Relying on the Supreme Court's clear identification of the Second Amendment right in *Heller* and *Bruen* as the right of "law-abiding" citizens to keep and bear arms, numerous post-*Bruen* courts have concluded that Section 922(g)(1) disqualifying convicted felons from the Second Amendment's protection is consistent with *Bruen*. *See*, *e.g.*, *United States v. Gleaves*, No. 3:22-CR-00014, 2023 WL 1791866, at *2 (M.D. Tenn. Feb. 6, 2023) ("[T]he Court agrees with the overwhelming consensus that *Bruen* is not an elixir for a federal firearm law violation committed by a felon."); *United States v. Isaac*, No. 522CR117LCBHNJ1, 2023 WL 1415597, at *5 (N.D. Ala. Jan. 31, 2023) ("*Bruen* did not disturb *Heller* but took great lengths to clarify it, and nothing in *Bruen* conflicts with the Eleventh Circuit's construction of *Heller* regarding § 922(g)(1)'s harmony with the Second Amendment."); *United States v. Brown*, No. CR 20-260-1, 2023 WL 424260, at *2 (E.D. Pa. Jan. 26, 2023) (noting that the Supreme Court's "Second Amendment jurisprudence does not extend to 18 U.S.C. § 922(g)" and finding that, "until the Supreme Court directs otherwise, Mr. Brown's facial challenge to § 922(g) fails"); *United States v. Garrett*, No. 18 CR 880, 2023 WL 157961, at *3 (N.D. Ill. Jan. 11, 2023) (noting "the controlling law of this circuit upholding the categorical felony firearms ban of § 922(g)"); *United States v. Coleman*, No. 3:22-CR-8-2, 2023 WL 122401, at *2 (N.D. W. Va. Jan. 6, 2023) ("the reach of *Bruen* ends at the feet of those individuals who are not law-abiding citizens"); *United States v. Reese*, No. 19-CR-257, 2022 WL 16796771, at *1 (W.D. Pa. Nov. 8, 2022) (finding "that Section 922(g) remains constitutional in light of *Heller* and *McDonald*, and *Bruen* does not alter that conclusion"); *United States v. Young*, No. CR 22-054, 2022 WL 16829260, at *7-8 (W.D. Pa. Nov. 7, 2022) (finding that "*Bruen, Heller* and *McDonald* dictate that Defendant's alleged conduct does not fall within the scope of the Second Amendment's protections due to his felony drug convictions" and noting that, after *Bruen*, "virtually all of the district courts to have considered facial challenges to the constitutionality of 18 U.S.C. Sections 922(g), 923, and 924, have uniformly upheld their constitutionality"); *United States*

*v. King*, No. 21-CR-255 (NSR), 2022 WL 5240928, at *5 (S.D.N.Y. Oct. 6, 2022) (finding that Section 922(g)(1) is constitutional and noting that "the *Bruen* majority opinion makes abundantly clear that *Heller* and *McDonald* stand as controlling precedents" and "repeatedly notes that the petitioners are 'law-abiding' citizens"); *United States v. Jackson,* No. CR 21-51 (DWF/TNL), 2022 WL 4226229, at *2 (D. Minn. Sept. 13, 2022) (denying facial challenge to Section 922(g)(1) and noting that, "[f]ollowing *Heller* and *McDonald*, the Eighth Circuit upheld the constitutionality of 18 U.S.C. § 992(g)(1) in *United States v. Seay*, 620 F.3d 919, 924 (8th Cir. 2010)," which "remains good law" after *Bruen*); *United States v. Cockerham*, No. 5:21-CR-6-DCB-FKB, 2022 WL 4229314, at *2 (S.D. Miss. Sept. 13, 2022) (finding that Section 922(g)(1) is not unconstitutional and noting that, after *Bruen*, "Federal courts nationwide have rejected similar facial constitutional challenges to the felon-in-possession statute."); *United States v. Ingram*, No. CR 0:18-557-MGL-3, 2022 WL 3691350, at *3 (D.S.C. Aug. 25, 2022) (finding that under *Heller* and *Bruen*, the Second Amendment does not protect possession of firearms by "non-law-abiding citizens").

The Court finds that, pursuant to *Heller*, as reaffirmed by *Bruen*, the Second Amendment protects conduct by "law-abiding" citizens, not convicted felons. The Court joins the majority of post-*Bruen* courts in finding that *Heller*, as reaffirmed by *Bruen*, dictates that possession of firearms by convicted felons is not conduct protected by the Second Amendment.

Even assuming arguendo that possession of firearms by convicted felons is protected conduct under the Second Amendment, as some post-*Bruen* courts have found, *see, e.g.*, *Campiti v. Garland*, No. 3:22-CV-177 (AWT), 2023 WL 143173, at *3 (D. Conn. Jan. 10, 2023) ("The plain text of the Second Amendment covers the plaintiff's potential conduct."); *United States v. Price*, No. 2:22-CR-00097, 2022 WL 6968457, at *7 (S.D.W. Va. Oct. 12, 2022) (finding that possession of firearms by convicted felons "is covered by the plain text of the Second Amendment"), the Third Circuit has already conducted the post-*Heller* historical analysis of traditional justification "for stripping felons, including those convicted of offenses meeting the traditional definition of a felony, of their Second Amendment rights." *Binderup v. Att'y Gen. United States of Am.,* 836 F.3d 336, 348 (3d Cir. 2016), *abrogated on other grounds*

by *Bruen*. In *Binderup*, the Third Circuit noted that "[m]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Id.* It stated that "unvirtuous citizens" is a broad category covering "any person who has committed a serious criminal offense, violent or nonviolent," finding that "[t]he view that anyone who commits a serious crime loses the right to keep and bear arms dates back to our founding era." *Id.* at 348-49. Thereafter, the Third Circuit held "that the legislature's designation of an offense as a felony is generally conclusive in determining whether that offense is serious," and noted that, "[s]ince *Heller*, we, along with every court to consider the issue, have rejected challenges that § 922(g)(1) on its face violates the Second Amendment." *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 900-01 (3d Cir. 2020), *abrogated on other grounds by Bruen*.

Nothing in *Bruen* disturbs the Third Circuit's post-*Heller* finding that the tradition of excluding convicted felons from the right to bear arms dates back to the founding era or its post-*Heller* holding that Section 922(g)(1) does not violate the Constitution on its face. *See Reese*, 2022 WL 16796771, at *1 (finding that the Third Circuit has already engaged "in a historical analysis of Section 922(g)" in *Binderup* and "found that the historical understanding of the Second Amendment did not include felons in possession"); *Young*, 2022 WL 16829260, at *8 (relying on the historical tradition as set forth in *Binderup* and noting that "the tradition of a limited, as opposed to an unrestricted right to bear arms was based upon a common-law tradition that even pre-dated the Constitution"); *see also Garrett*, 2023 WL 157961, at *4 ("the Seventh Circuit's pre-*Bruen* caselaw holds that § 922(g) is not unconstitutional in light of *Heller* and *McDonald*, and *Bruen* does not disturb that conclusion.") (citing *Hatfield v. Barr*, 925 F.3d 950, 953 (7th Cir. 2019) holding that non-violent felons can be categorically dispossessed of firearms consistent with the Second Amendment). Accordingly, the Court is bound by the Third Circuit's analysis of the historical tradition of firearm regulation in *Binderup* and finds, alternatively, that Section 922(g)(1), prohibiting convicted felons from possessing firearms, is constitutional because it is consistent with this Nation's historical tradition of firearm regulation. *Heller*, 554 U.S. at 626.

*United States v. Walter, et al.*
Case No. 3:20-cr-0039
Memorandum Opinion
Page **7** of **16**

### B. Section 922(k) and 23 V.I.C. § 481(b) - Possession of a Firearm with an Obliterated Serial Number

Section 922(k) prohibits any person from possessing "any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered." 18 U.S.C. § 922(k). Title 23, Section 481(b) of the Virgin Islands Code contains language similar to its federal counterpart also prohibiting possessing a firearm with an obliterated or altered serial number. At this time, only handful of post-*Bruen* courts addressed the constitutionality of Section 922(k), with the first one to do so finding it unconstitutional. *See Price*, 2022 WL 6968457, at *6. Other courts rejected constitutional challenges to Section 922(k). *See United States v. Tita*, No. CR RDB-21-0334, 2022 WL 17850250, at *7 (D. Md. Dec. 22, 2022) (finding that "the conduct outlined in 18 U.S.C. § 922(k) is not protected by the Second Amendment because it does not infringe on an individual's right to bear arms 'in case of confrontation' or self-defense," and even if it was protected, "analogous conduct has been historically regulated such that 18 U.S.C. § 922(k) is constitutional"); *United States v. Bradley*, No. 2:22-CR-00098, 2023 WL 2621352, at *3-4 (S.D.W. Va. Mar. 23, 2023) ("The Court finds that the plain text of the Second Amendment does not cover conduct regulated by § 922(k)" and, alternatively, § 922(k) "is constitutional because there are relevant historical analogues that offer comparable burdens on the right to bear arms."); *United States v. Serrano*, 21-CR-1590, 2023 WL 2297447 (S.D. Cal. Jan. 17, 2023) ("The Court finds that the Second Amendment's plain text does not cover the conduct regulated by § 922(k)"); *United States v. Reyna*, No. 3:21-CR-41 RLM-MGG, 2022 WL 17714376, at *1 (N.D. Ind. Dec. 15, 2022) (holding that "the plain text of the Second Amendment doesn't reach a handgun without a serial number"); *United States v. Holton*, No. 3:21-CR-0482-B, 2022 WL 16701935, at *4 (N.D. Tex. Nov. 3, 2022) (finding that "a law requiring serial numbers on firearms " does not infringe "on the right to keep and bear arms," and even if it did, "the Government has identified relevant historical analogues to meet its burden under *Bruen*").

In *Price*, the court found that Section 922(k) falls within the Second Amendment's plain text because it "criminalizes the mere *possession* of a firearm after a serial number is removed, obliterated, or altered in any way," based on the hypotheticals in which "a law-abiding citizen" removes the serial number after legally purchasing a firearm, making that

person's possession illegal, and leaves the same firearm to his "law-abiding" daughter, making her possession also illegal. *Price*, 2022 WL 6968457, at *3. In considering whether Section 922(k) is consistent with the Nation's historical tradition of firearm regulation, the court stated it was "undisputed that serial numbers were not required, or even in common use, in 1791" and "difficult to imagine" that the societal problems addressed by Section 922(k), namely, crimes involving stolen firearms and assisting law enforcement in solving crimes, "did not exist at the founding." *Id.* at *5. However, the court rejected the argument that historical restrictions on certain types of weapons that can be possessed are analogous to Section 922(k)'s prohibition on possession of a firearm without a serial number, concluding that Section 922(k) is unconstitutional. *Id.* at *6.

The *Holton* court disagreed with *Price*'s interpretation of Section 922(k), finding that requiring serial numbers on firearms does not infringe "on the right to keep and bear arms." *Holton*, 2022 WL 16701935, at *4. The court reasoned that, "[w]hile § 922(k) may restrict one manner in which individuals may keep and carry firearms, this restriction does not infringe on an individual's right to bear arms for self-defense" because, as *Heller* instructs, "[t]he Second Amendment 'is not a right to keep and carry any weapon whatsoever in any manner whatsoever.'" *Id.* (quoting *Heller*, 554 U.S. at 626). In support of its finding of no infringement, the *Holton* court relied on the Third Circuit post-*Heller* decision *U.S. v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), *abrogated on other grounds by Bruen*, stating that "the presence of a serial number does not impair the use or functioning of a weapon in any way[.] ... [A] person is just as capable of defending himself with a marked firearm as with an unmarked firearm." *Holton*, 2022 WL 16701935, at *4 (quoting *Marzzarella*, 614 F.3d at 94). Even if Section 922(k) infringes on the Second Amendment right, the court found that *Bruen* "does not require a 'historical twin,'" and historic commercial firearm regulations and registration and taxation requirements applicable to firearm owners are sufficiently analogous to Section 922(k), making it consistent with the historical understanding of the Second Amendment and constitutionally sound. *Id.* at *4-6.

In *Serrano*, the court concluded that "the Second Amendment's plain text does not cover the conduct regulated by § 922(k)" because it does not prohibit law-abiding citizens

from possessing and carrying a firearm for self-defense, "provided that firearm has a serial number"; rather, it only restricts "one manner in which individuals may keep and carry firearms." *Serrano*, 2023 WL 2297447, at *11 (citation omitted). The court further found that even if the Second Amendment protects the conduct regulated by § 922(k), this section is consistent with this Nation's history of firearm regulation and "burdens an individual's right to armed self-defense in a manner comparable to historical firearm regulations." *Id.* at *12-13.

The Court agrees with the reasoning in *Holton* and its reliance on *Marzzarella*, including the Third Circuit's finding that "Section 922(k) did not bar Marzzarella from possessing any otherwise lawful marked firearm for the purpose of self-defense." *Marzzarella*, 614 F.3d at 94. In determining whether the possession of an unmarked firearm is protected by the Second Amendment, the Third Circuit in *Marzzarella* relied on *Heller*'s finding that the Second Amendment "affords no protection to weapons not typically possessed by law-abiding citizens for lawful purposes.'" *Id.* at 91 (quoting *Heller*, 554 U.S. at 2815–16). Noting that "serial numbers on firearms did not exist at the time of ratification," the Third Circuit stated that "[i]t would make little sense to categorically protect a class of weapons bearing a certain characteristic when, at the time of ratification, citizens had no concept of that characteristic or how it fit within the right to bear arms," as well as "weapons bearing a certain characteristic wholly unrelated to their utility." *Id.* at 93-94. Nothing in *Bruen* disturbs *Marzzarella*'s first-step analysis of the threshold question whether Section 922(k) regulates conduct that falls within the scope of the Second Amendment.

Consistent with *Heller* and *Bruen*, the Court finds that firearms with obliterated serial numbers are not typically used by law-abiding citizens for lawful purposes. *Reyna*, 2022 WL 17714376, at *5 ("Guns with obliterated serial numbers belong to 'those weapons not typically possessed by law-abiding citizens for lawful purposes' so possession of such guns isn't within the Second Amendment's scope.") (quoting *Heller*, 554 U.S. at 625); *United States v. Colon-Quiles*, 859 F. Supp. 2d 229, 234 (D.P.R. 2012) ("[T]his Court cannot identify any lawful purpose that would be served by obliterating a serial number on a firearm."). Accordingly, Section 922(k)'s conduct is not protected by the Second Amendment. *See Tita*,

WL 17850250, at *7; *Reyna*, 2022 WL 17714376, at *5; *Holton*, 2022 WL 16701935, at *4. For the same reasons, conduct prohibited by Title 23 of the Virgin Islands Code § 481(b), namely, possession of a firearm with altered or obliterated identification marks, is not within the scope of the Second Amendment's protection.

Even assuming arguendo that possession of firearms with obliterated serial numbers is protected conduct under the Second Amendment, as found by some courts, *see Price*, 2022 WL 6968457, at *3, *Rigby v. Jennings*, No. CV 21-1523 (MN), 2022 WL 4448220, at *7 (D. Del. Sept. 23, 2022) (finding that the Second Amendment "protects the possession of untraceable firearms and unfinished firearms and receivers because its text covers the possession of firearms"), the Court finds, alternatively, that Section 922(k) is consistent with this Nation's historical tradition of firearm regulations. *Bruen* contemplates that "historical inquiry that courts must conduct will often involve reasoning by analogy" and that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2132-33. The Court finds that historical regulations on which *Serrano* and *Holton* relied, namely, commercial regulations controlling firearms trade, as discussed in *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017), and regulations applicable to firearm owners pertaining to registration and taxation, as discussed in certain legal articles,[1] *Holton*, 2022 WL 16701935, at *5, are sufficiently analogous to Section 922(k) and support the conclusion that Section 922(k) is consistent with this Nation's historical tradition of firearm regulations under *Bruen*. Accordingly, Section 922(k) and, consequently, Title 23 of the Virgin Islands Code § 481(b), are constitutional.

### C. Section 922(q)(2)(A) - Possession of a Firearm within 1,000 Feet from School Grounds

---

[1] Those articles are "*Gun Law History in the United States and the Second Amendment*, 80 Law & Contemp. Probs. 55, 76 (2017) (citing Virginia Act of Feb. 27, 1631, Act LVI) . . . Meg Penrose, *A Return to the States' Rights Model: Amending the Constitution's Most Controversial and Misunderstood Provision*, 46 Conn. L. Rev. 1463, 1483 (2014) [and] *Minutes from a Convention of the Federalist Society: Civil Rights: The Heller Case*, 4 NYU J.L. & Liberty 293, 309 (2009)." *Holton*, 2022 WL 16701935, at *5.

Section 922(q)(2)(A) prohibits any individual from possessing a firearm "at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(2)(A). "The term 'school zone' means--(A) in, or on the grounds of, a public, parochial or private school; or (B) within a distance of 1,000 feet from the grounds of a public, parochial or private school." 18 U.S.C.A. § 921 (26).

The Supreme Court made clear in *Heller* that nothing in its opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626. *Bruen* reaffirmed *Heller*, stating that, "[a]lthough the historical record yields relatively few 18th and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.,* legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions," citing to "D. Kopel & J. Greenlee, The 'Sensitive Places' Doctrine, 13 Charleston L. Rev. 205, 229-236, 244-247 (2018)" and the Independent Institute *amicus curiae* brief. *Bruen*, 142 S. Ct. at 213. The Supreme Court noted that, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster," which is why "courts can use analogies to 'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings' to determine whether modern regulations are constitutionally permissible." *Id.* at 2118. Since *Heller*, as reaffirmed by *Bruen*, clearly established that schools are sensitive places and laws prohibiting possession in sensitive places such as schools are constitutionally sound, the Court can use analogies to longstanding prohibitions in sensitive places to determine whether Section 922(q)(2)(A) prohibition of firearm possession within 1,000 feet from the school grounds is constitutionally permissible.

Congressional findings, as stated in Section 922(q)(1), include that "firearms have been found in increasing numbers in and around schools," "parents may decline to send children to school" due to concerns about gun violence, "the occurrence of violent crime in school zones has resulted in a decline in the quality of education in our country," and "school systems that have made strong efforts to prevent, detect, and punish gun-related crime find

their efforts unavailing due in part to the failure or inability of other States or localities to take strong measures." These findings indicate that safety concerns and effective prevention of gun violence in school zones were paramount reasons for enacting Section 922(q). The Court can look at analogous historic regulations in determining whether Section 922(q)(2)(A)'s prohibition of firearms within a distance of 1,000 feet from the school grounds is consistent with this Nation's historical tradition of firearm regulation. *Bruen*, 142 S. Ct. at 2118.

Certain jurisdictions during the colonial and founding periods adopted restrictions on arms in sensitive places, such as the 1647 and 1650 Maryland laws banning "arms carrying in either house of the legislature," and the 1776 Delaware Constitution preventing "armed intimidation of polling places." Kopel & Greenlee, *supra*, at 235. In 1782, Boston "enacted a unique ordinance, expressly for fire protection. Loaded guns could not be brought into buildings in town." *Id.* at 240. The Independent Institute *amicus curiae* brief ("II Brief") cited by the Supreme Court in *Bruen* states that, in 1786, Virginia enacted a law prohibiting "most (but not all) people from 'com[ing] before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms," while allowing the Ministers of Justice and persons assisting them "to keep their weapons." (II Brief at 12.) While "the colonial era saw few restrictions on the right to carry weapons," "[t]he few New World restrictions on the right to carry arms in certain areas, however, were limited in a way similar to the Statue of Northampton—*i.e.*, no weapons in areas near certain core government operations in which security was assured by the government." (*Id.* at 12-13.) Following the Declaration of Independence, gun-free zones continued to exist in "areas in which the government provided the requisite security to compensate for the deprivation of the self-defense right," such as polling places, which "developed into areas in which the government could appropriately limit the right of individuals to carry weapons." (*Id*. at 13.)

Not only is there historical evidence of regulation on firearms in sensitive places, but there is also evidence of laws creating "buffer zones" around those places as well. For example, the Delaware Constitution of 1776 prohibited any private person from coming armed to an election, and also specifically "outlawed any 'battalion or company' from coming

within *a mile* of a polling place for twenty-four hours before or after the election." *See* Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 473 (2019) (quoting Del. Const. art 28 (1776) in The Federal and State Constitutions, Colonial Charters and Other Organic Laws of the United States 277 (2d ed. 2001)). The express purpose of these restrictions was "[t]o prevent any violence or force being used at the said elections." *Id.* (quoting Del. Const. art 28 (1776), in The Federal and State Constitutions, Colonial Charters and Other Organic Laws of the United States 277 (2d ed. 2001)). Later that same year, Maryland "passed a substantially similar resolution, for similar reasons." Miller, *supra*, at 473. Moreover, during the 19th century, several states also had similar laws prohibiting weapons around polling places. Louisiana prohibited individuals from carrying any "dangerous weapon, concealed or unconcealed, on any day of election or registration…within a distance of one-half mile of any place of registration or revision of registration." *See id*. (quoting Act of Mar. 16, 1870, sec. 73, 1870 La. Acts 159). Maryland and Texas enacted similar provisions. *See* Kopel & Greenlee, *supra*, at 251, Miller, *supra*, at 472.

In the education context, the state of New Jersey enacted a statue in 1874 adding a three-mile buffer around Drew University to exclude certain commercial activities, including "pistol-shooting." Kopel & Greenlee, *supra,* at 251. And in Texas, Missouri, and Oklahoma, guns were prohibited not just in schools, but anywhere persons assembled for educational, scientific, or literary purposes. *See* Miller, *supra*, at 472.

The Independent Institute Amicus Brief on which *Bruen* relied suggested that one way for the modern laws to "remain faithful to the reasoning and history underlying the Second Amendment" is "to limit modern gun-free zones to areas in which the government has demonstrated a serious commitment and a realistic ability to ensure public safety." (II Brief at 22.) Congressional findings underlying Section 922(q) indicate that the Nation's school systems, public and private alike, have demonstrated such commitment to ensure public safety, but their efforts were not sufficient, without more, to prevent the rampant and unabating gun violence in and around the Nation's schools. Moreover, similarly to the relevant historic restrictions limiting, but not entirely banning firearm possession in, for example, courthouses, Section 922(q)(2)(A)'s prohibition of firearms within a distance of

1,000 feet from the school grounds provides for certain exceptions. *See* 18 U.S.C. § 922(q)(2)(B) (providing various exceptions to Section 922(q)(2)(A), including possession of a firearm in private property not part of the school grounds, possession by a licensed person of a firearm not loaded and in a locked container, or a locked firearms rack that is on a motor vehicle, possession by an individual for use in a school-approved program in the school zone, and possession by a law enforcement officer acting in her official capacity). To the extent that weapons were prohibited "in areas near certain core government operations in which security was assured by the government," (II Brief at 12-13), public school zones are analogous to those areas requiring security measures, and, by extension, private school zones are also similarly analogous. Nothing in *Heller* or *Bruen* prevents the Court from treating Section 922(q)(2)(A) analogous to the Nation's traditional firearm restrictions in "sensitive places," such as courthouses, legislative places and polling places, or provides a basis for a strict and narrow interpretation of the meaning of "analogous" as to limit "sensitive places" only to the physical perimeter of the school grounds. Moreover, nothing in *Heller* or *Bruen* suggests that the safety of the public in traditional "sensitive places" such as courthouses, legislative places, and polling places, is any more deserving than the safety of the public, especially students, not only inside the schools but also around the schools today.

Reasoning by analogy to the relevant historic tradition of prohibitions of firearms in the houses of legislatures, polling places, courthouses, or other areas near core government operations requiring security of their occupants and prevention of gun violence, the Court finds that the area within 1,000 feet of the school grounds is within the scope of "sensitive places" as contemplated by *Heller* and required to ensure security of the school's occupants and to prevent gun violence. *Cf. United States v. Lewis,* 50 V.I. 995, 1001 (D.V.I. 2008) ("It is beyond peradventure that a school zone, where Lewis is alleged to have possessed a firearm, is precisely the type of location of which *Heller* spoke. "); *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019), *abrogated on other grounds by Bruen* (As for the Maryland Avenue parking lot approximately 1,000 feet from the entrance to the Capitol, "although it is not a government building, we conclude that it is sufficiently integrated with the Capitol for *Heller I*'s sensitive places exception to apply."). *Hall v. Garcia*, No. C 10-03799 RS, 2011 WL 995933,

at *4 (N.D. Cal. Mar. 17, 2011) (noting that, "[f]or the same reason that schools are sensitive places—the presence of large numbers of children either at school or traveling to and from it—possession of firearms within some distance around such locations similarly presents the risk of danger and disruption" and finding that Section 922(q) does not violate the Second Amendment). Accordingly, Section 922(q)(2)(A) is analogous to this Nations historical tradition of lawfully disarming citizens in "sensitive places" and is constitutionally sound. *See United States v. Redwood*, No. 16 CR 00080, 2016 WL 4398082, at *5 (N.D. Ill. Aug. 18, 2016) ("§ 922(q)(2)(A) does not infringe upon the core component of the Second Amendment").

### D.  14 V.I.C. § 2253(a) – Unauthorized Possession of a Firearm

Title 14 of the Virgin Islands Code § 2253(a) prohibits possession of a firearm "unless otherwise authorized." Title 23 of the Virgin Islands Code governing the firearm licensing regime provides that "a person who has been convicted in any court for a crime punishable by imprisonment for a term exceeding one year" is ineligible for a license to possess or carry a firearm. 23 V.I.C. § 456a(a)(1).

Defendants argue that Title 14 and Title 23 of the Virgin Islands Code violate the Second Amendment under *Bruen* because they impose discretion on licensing official that was found unconstitutional, including a "special need" requirement rejected in *Bruen*. The Government concedes that the Virgin Islands is not "generally characterized as a 'shall issue' jurisdiction," since its licensing regime contains discretionary criteria, such as 23 V.I.C. §§ 454(3) (requiring an applicant for a license to establish "proper reason for carrying a firearm"), 456(a)(6) (requiring that the Commissioner shall not issue a firearm license unless "no proper reason exists to deny" an application), and 458(a) (requiring that the Commissioner shall not issue a firearm license to any person "deemed to be an improper person by the Commissioner"). The Government, however, argues that the Virgin Islands licensing regime also contains non-discretionary criteria, such as 23 V.I.C. § 456a(a)(1) relevant here.

Regardless of whether the Virgin Islands firearm licensing regime is a "shall issue" jurisdiction, where authorities must issue licenses "when applicants satisfy certain threshold

requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability," or a "may issue" jurisdiction, where authorities have discretion to deny licenses when applicants fail to show cause or suitability, *Bruen*, 142 S. Ct. at 2123-24, the non-discretionary provision of the Virgin Islands licensing regime categorically excludes convicted felons from eligibility "for a license to possess or carry a firearm." 23 V.I.C. § 456a(a)(1). Nothing in *Bruen* calls into question non-discretionary criteria for excluding persons from possession of firearms, such 23 V.I.C. § 456a(a)(1).

Since convicted felons are ineligible for a firearm license under the non-discretionary provision, there is no need to address constitutionality of Section 2253(a). *See Kajmowicz v. Whitaker*, 42 F.4th 138, 153–54 (3d Cir. 2022) ("the principles of constitutional avoidance and judicial restraint . . . counsel courts to avoid deciding issues, especially constitutional ones, when they need not do so in order to resolve cases."). Even assuming arguendo that any discretionary criteria of the Virgin Islands licensing regime are inconsistent with *Bruen*, the Virgin Islands' broad severability clause provides that invalid provisions shall be severed, and such determination of invalidity shall not affect other valid provisions. 1 V.I.C. § 52.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' motions to dismiss, ECF Nos. 179 and 180, are denied. An appropriate Order follows.

**Dated:** April 20, 2023         */s/ Robert A. Molloy*
                                  **ROBERT A. MOLLOY**
                                  **Chief Judge**