**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 3:20-cr-0039 |
| ) | |
| **ROMEO WALTER and KENAN THOMAS,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**ATTORNEYS:**

**DELIA L. SMITH, UNITED STATES ATTORNEY**
**KYLE R. PAYNE, ASSISTANT U.S. ATTORNEY**
UNITED STATES ATTORNEY'S OFFICE
ST THOMAS, U.S. VIRGIN ISLANDS
  *FOR PLAINTIFF UNITED STATES OF AMERICA*

**MATTHEW A. CAMPBELL, FEDERAL PUBLIC DEFENDER**
**KIA D. SEARS, ASSISTANT FEDERAL PUBLIC DEFENDER**
OFFICE OF THE FEDERAL PUBLIC DEFENDER
ST THOMAS, U.S. VIRGIN ISLANDS
  *FOR DEFENDANT KENAN THOMAS*

**MEMORANDUM OPINION**

**MOLLOY, Chief Judge.**

**BEFORE THE COURT** is Defendant Kenan Thomas' ("Thomas") Motion to Suppress Evidence and Statements. (ECF No. 86.) The United States of America ("the Government") opposed the motion. (ECF No. 90.) Thomas is charged by a grand jury indictment with violations of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count Two "Felon in Possession of a Firearm"), 18 U.S.C. §§ 922(k), 924(a)(1)(B) and 2 (Count Three "Possession of a firearm with an obliterated serial number"), 18 U.S.C. §§ 911(q), 914(a)(1)(B) and 2 (Count Four "Possession of a firearm in a school zone"), 14 V.I.C. § 2253(a) (Count Six "Unauthorized possession of a firearm"), and 23 V.I.V. § 481(b) (Count Seven "Possession of a Firearm with

an Obliterated Serial Number").[1] The Court held an evidentiary hearing on September 7, 2022. Supplemental briefs were filed by the Government (ECF No. 177) and Thomas (ECF No. 178.) For the reasons that follow, the motion is granted in part and denied in part.

### I. FACTUAL BACKGROUND

#### A. Testimony of Officer Kyle Gabriel

Officer Kyle Gabriel ("Gabriel") testified that, on April 8, 2020, he was in a marked car with his partner behind the marked car of Detective Richie Velazquez ("Velazquez") when he observed a blue truck and four black men, one of whom was in the white shirt and one in all black, scurrying as officers drove into Jah Yard in Hospital Ground, St. Thomas. (ECF No. 188, Tr. 6-8.) Gabriel is familiar with Jah Yard because he responded to calls for shots fired and people getting shot in that area. (Tr. at 7.) Gabriel approached the blue truck to inquire where the four men ran, and the occupant stated they ran toward an abandoned house. (*Id*.) Gabriel then asked Sergeant Alister Carty ("Carty") to follow him to clear the house, but the four men were not there. (*Id.* at 8.) When Gabriel and Carty proceeded to the back trail heading west, Gabriel saw the four men peeping to see where the officers were going. (*Id.*) Gabriel observed the man dressed in all black clutching a black duffel bag and a black backpack. (*Id.* at 9.) Sergeant Carty stated "Stop," after which the men began to run away. (*Id.* at 9-10.) Gabriel and Carty chased the men who ran up the stairway leading to Maud Proudfoot Drive. (*Id.* at 10.) During the chase, Gabriel saw what appeared to be a pistol whip in the small of the back of the man who was in all black and carrying the bags. Carty then said "gun." (*Id.*) The officers eventually stopped their chase because they lost sight of the men. (*Id.*)

Thereafter, Gabriel went down the street and saw three of the four men. One was on the top of the porch of the green house, and two were on the ground next to the house. (*Id.*) The men were helping each other up to the top of the porch and passing the bags up to each other. (*Id.*) As Carty approached, he gave commands, which were ignored again. While giving the commands, Carty simultaneously heard a scream. (*Id.* at 12.) Gabriel went down towards

---

[1] Counts Five, Eight and Nine in the Indictment against Thomas were dismissed without prejudice on December 6, 2022. (ECF No. 192.)

the driveway of the green house where he saw the man in all black throwing the duffel bag and the backpack to the lower level. (*Id.* at 12-13.) Gabriel commanded him to stop but the man refused, jumped over the rail from the porch, picked up the bags and proceeded toward the shanty. (*Id.* at 13.) As the man in all black jumped the fence, Gabriel ran toward the fence and saw him go around to the shanty. (*Id.*) Gabriel lost sight of him for about seven or eight seconds as he and Carty went toward the shanty. (*Id.* at 13-14*.*) Gabriel heard a door slam and then saw the man in all black "walking out with nothing in his hands." (*Id.* at 14.) Gabriel said, "I can see you," but the man kept walking, after which Gabriel heard Carty say, "Get on the ground. Get on the ground." (*Id.* at 14.) Gabriel then jumped the fence and assisted Carty in detaining the man in all black, who was identified to be Thomas. (*Id.* at 17.) Gabriel asked Thomas where the bags were because Gabriel believed they contained "either drugs or firearms." Thomas responded he did not have any bags. (*Id.*) When Gabriel and Carty patted down Thomas for their safety, the officers did not see any firearm on him. (*Id.*) Additionally, when Thomas jumped down from the balcony, and Gabriel was chasing him to the fence line, Gabriel did not see Thomas with any firearm either. (*Id.* at 18.) Gabriel "proceeded to clear the structure that Mr. Thomas came out of" for "officer safety" because he did not know the whereabouts of the other suspects. (*Id.* at 17.) While Gabriel does not recall if the door was open when he entered the shanty, he stated that upon entering, he saw the two bags that Thomas was carrying in plain view on the ground, in the back room. (*Id.*) After seeing the bags, Gabriel exited the shanty and spoke to Carty. (*Id.*) Gabriel did not know where the other men went when Thomas jumped down with the bags. (*Id.* at 19.) Gabriel identified Thomas in the courtroom as the man in all black. (*Id.* at 27.) Gabriel inventoried the duffel bag Thomas was carrying in the police station, finding it contained AK pistol and other firearms. (*Id.* at 28.)

On cross-examination, Gabriel stated he wrote a report based on his observations on April 8, 2020, and that he did not take any notes or make any calls over the radio that would have been recorded. (*Id.* at 29.) Gabriel testified that three marked cars traveled to Jah Yard on April 8, 2020, including his, with two officers in each. (*Id.* at 31.) In his report, Gabriel wrote that he observed several black men, not four, but denied that the surveillance video

he watched was a source of information about the number of people he observed. (*Id.* at 33.) Gabriel assumed that the occupants of the blue truck could see where the men ran because they were talking to them. (*Id.* at 35.) Gabriel did not obtain the names of the blue truck occupants and he did not make any radio calls or hear anything over the radio. (*Id.* at 36-37.) He testified that six or seven minutes passed between the time he and Carty decided to pursue the men and when he saw the men again. (*Id.* at 37.) Gabriel testified that he did not see any firearms when he initially pulled up on the block and saw the black men run or when he saw the men peeping, and he did not see the contents of the two black bags until they were seized. (*Id.* at 39.) He also stated that he did not see the person he was chasing enter inside the wooden shanty, but he assumed the person entered it because he heard the door slam. (*Id.* at 49.) No radio calls were made at that time. (*Id.*) Gabriel testified that Thomas did not resist the arrest. (*Id.* at 51.)

### B. Testimony of Officer Allister Carty

Carty testified that, on the afternoon of April 8, 2020, he and Gabriel were assigned to the Hospital Ground area in St. Thomas because the morning before there was a homicide in Jah Yard near that area. (*Id.* at 56.) Carty is familiar with that area because he has had to respond to shootings, and other purported illegal activities in the area on multiple occasions. (*Id.* 57.) When Carty's patrol car entered the area, he observed three men sitting by an abandoned residence. (*Id.* at 58.) When the men saw the police car drive into Jah Yard, they took off running on foot. (*Id.*) There were two or three police cars there. (*Id.*) Gabriel and Carty parked the patrol car in order to conduct an inspection on foot. (*Id.* at 59.) Gabriel and Carty observed the three men hiding in a bush behind an abandoned house, ducking down to see who was coming up the path. (*Id.* at 58-60.) When Carty and Gabriel identified themselves as police, the men started to run again. (*Id.* at 61.) Carty stated that, based on their clothing, he believed the three men who were running were the same three men he first observed when the officers pulled into Jah Yard. One of them was wearing all black and had a black duffel bag and a black backpack. (*Id.*) While the man in all black was running, Carty testified that it appeared that the man had a weapon tucked down in the small of his back, which caught Carty's attention because the man was wearing bright orange boxers. (*Id.* at

61-62.) Upon noticing the weapon, Carty yelled to Gabriel, "Kyle, gun." (*Id.* at 62.) When the men reached the top of the stairs, they ran down to the porch of the green residence on Maud Proudfoot Drive. (*Id.*) When they were at the porch, Carty could hear a female screaming inside the residence. (*Id.*) Carty was instructing the men, "come out. Police," but they did not comply and started running again. (*Id.* at 62-63.) Gabriel went after the men, but Carty ran down Maud Proudfoot Drive and into Jah Yard. (*Id.* at 63.) When Carty entered Jah Yard, he met the man wearing all black who was running from the shanty with the door open toward Carty. (*Id.* at 65.) It was the same person he saw earlier. (*Id.* at 67.) Carty ordered him to stop and get down on the ground, and the man complied. (*Id.* at 65.) Nothing was found on his person. (*Id.* at 67.) When Gabriel arrived from the same direction as the man in all black, Carty pointed to Gabriel that the door was open. (*Id.* at 68.) Gabriel conducted an inspection of the shanty to see if other men were there, since it was three persons who fled from the police. (*Id.*) Carty waited for Gabriel to inspect the shanty and for other officers to arrive. (*Id.* at 69.) The officers who arrived on the scene were Officer Angol and Detective Velazquez. (*Id.* at 69.) Carty testified that he asked the person who resides and owns the shanty, to which he responded, "his people," and refused to give his name. (*Id.*) When Carty asked if his people were there, the person responded they were not. (*Id.* at 72.) Carty identified Thomas in the courtroom as the person he arrested. (*Id.* at 70.) After the search was conducted at the shanty, Carty saw that the two bags Thomas was carrying contained firearms. (*Id.* at 72.)

On cross-examination, Carty testified that the report he created about the incident, showing April 8 on page one but April 9 on page two, did not indicate that the person Carty spoke with at the shanty stated that he resided there; rather, he only stated "his people" resided there. (*Id.* at 74.) Carty did not ask the person if Thomas was one of his people since the person stated his people were not there in Thomas's presence. (*Id.* at 75.) Carty testified that two to three patrol cars arrived together to conduct inspection of the Jah Yard, to check if any crimes were being committed and making sure that citizens had no complaints. (*Id.* at 77-78.) Carty confirmed that he only saw three individuals when he initially arrived in the area and no other persons, and it was those three individuals who ran away and were chased by Carty and Gabriel. (*Id.* at 78-79.) Carty could not remember if he radioed in his findings.

*United States v. Thomas*
Case No. 3:20-cr-0039
Memorandum Opinion
Page **6** of **18**

(*Id.* at 79.) According to Carty, when they first arrived at Jah Yard, the three individuals were on the street by the abandoned house, and they started running when they saw the police. (*Id.* at 80-81.) Carty then parked the patrol car, exited the vehicle, and started looking for the individuals who ran away. (*Id.* at 81.) Carty explained that he and Gabriel started looking in the general area of Jah Yard where they first noticed the men fleeing. (*Id.*) When asked if he observed any criminal activity by those individuals, Carty stated that "[i]t was just suspicious because they had bags and when we came up[,] they ran." (*Id.* at 82.) Carty believed it took two to three minutes or less from the time he exited the car to when he saw the persons hiding in the bush. (*Id.* at 83.) When asked what made him think that the individuals were hiding, Carty stated: "Their behavior. They are on the roadway and they are, like, stooping down, looking, you know, as if they are trying to evade the police. They weren't standing. They were stopping down looking, like, in a crouched position." (*Id.* at 83.) Carty stated that when the individuals were hiding, they were not doing anything criminal. (*Id.* at 86.) Carty made a radio call to say that the officers made contact with the individuals who were fleeing and described what they were wearing. (*Id.* at 85.) When the individuals were fleeing, Carty purportedly saw that the person dressed in black had a firearm in the small of his back. (*Id.* at 86.) Carty acknowledged that in his report, he wrote that he saw what appeared to be a firearm. (*Id.*) However, he did not transmit that information over a radio because he was too busy running after the individuals, notwithstanding he had time to yell out to Gabriel, "gun." (*Id.*) Carty lost site of the individuals when he and Gabriel approached the porch and Gabriel ran after them. (*Id.* at 88-89.) Minutes later, Carty was on foot pursuit in Jah Yard when he encountered the man who was coming from the open door. (*Id.* at 89.) Carty believed this man was one of the persons he was originally chasing, given that he was wearing black and had the same body structure as the person he was pursuing earlier. (*Id.*) When asked if he saw the person exit the shanty, Carty stated: "He is coming from towards that open door of the shanty. The area of the doorway of the shanty, he was walking out towards that way, towards me." (*Id.* at 90.) Carty wrote in his report that "the suspect was observed coming from the area of a shanty where an open door was located," but he testified that he did not see the individual coming out of the door of the shanty, he only saw him coming from the

area of the open door of the shanty. (*Id.* at 90-91.) At the time Carty saw the person coming from the area of the open door, the person was not committing any crime and Carty did not see a firearm. (*Id.* at 91.) Carty ordered the person to get on the ground so he could search him for safety and the person complied. (*Id.* at 91-92.) From where he was positioned, Carty could not see inside of the shanty or if anyone was inside the shanty, and he could not hear anything. (*Id.* at 92.) That is when he saw Gabriel and pointed to the open door and told him that the door was open. (*Id.*). Carty testified that the purpose of inspecting the inside of the shanty was to see if there were other individuals there. (*Id.* at 93.) Once it was established there was no one there, Carty testified he began detaining Thomas. (*Id.*) When asked why he did not obtain a warrant once the purpose of the entry to the shanty as satisfied, Carty responded it was not his "call" because "the Lieutenant of our Bureau, [] showed up," which relieved Carty of being the most senior officer on the scene. (*Id.* at 93-94.)

### C. Testimony of Detective Richard Velazquez

Velazquez testified that, on April 8, 2020, members of the Special Operations Bureau ("SOB") "were conducting a saturated patrol in and around the area of Hospital Ground to include the area of Jah Yard" because there was "an uptick in violent offenses in that area, specifically in the Hospital Ground, Jah Yard, area where we had shots fired," and "a week or so prior to our entering Jah Yard at that time there was a homicide." (*Id.* at 100.) Velazquez had previously conducted hundreds of patrols of that area "to disrupt, dismantle, and deter any criminal activity." (*Id.* at 100-01.) On April 8, 2020, Velazquez was operating a marked police car and did not recall who was with him, but there were five officers total that day. (*Id.* at 101.) When his car entered Jah Yard, Velazquez saw several individuals standing by a fence line next to a residence that he knew as an area were controlled substance sales were conducted because on several occasions, Velazquez found substantial quantities of controlled substance during inspections of that area. (*Id.* at 101-02.) Regarding the event in question, Velazquez remembered seeing three individuals who immediately ran from the area when they saw Velazquez's marked car. (*Id.*) Velazquez was asked what he did after he saw the three men run from the area to which he responded: "When I saw them run, I radioed, via my handheld radio, that suspects were running." (*Id.* at 102.) He explained that,

based on the plan set up prior to entering, officers were positioned in certain areas throughout the Maud Proudfoot Drive, Jah Yard, and Hospital Ground to try to cut off any avenues of escape. (*Id*.) In the area from where the three men ran, Velazquez saw several mason-style jars sitting on the base of the chain-link fence with green leafy substance inside, which he believed was marijuana. (*Id.* at 103.) After Velazquez radioed that the suspects had ran, Velazquez returned to the entrance of Jah Yard and believed he heard radio traffic saying that one of the individuals had a gun. (*Id.* at 103-04.) Velazquez saw one of the men detained in handcuffs on the ground in an open area in Hospital Ground. (*Id.* at 104.) Velazquez did not see anything on Thomas's person when he saw him. (*Id.* at 105.) When Velazquez entered the yard area, he saw a shack with the door open. (*Id.* at 104.) Velazquez testified that he received information that the individual detained ran into that shack. Consequently, Velazquez conducted a protective sweep to ensure there were no other individuals inside. (*Id.*) As Velazquez walked into the shack, on the right-hand side, he observed on the ground an extended magazine for a Glock model pistol, a backpack, and a black bag. (*Id.* at 107.) Velazquez then walked over to Thomas who was sitting on the ground handcuffed and asked him for his name and if he had any identification. (*Id.* at 108.) Thomas identified himself but did not possess any identification. (*Id.*) Velazquez inquired where Thomas came from and whether he had any prior interaction with law enforcement. Thomas stated there may be a warrant for his arrest in Georgia. (*Id.* at 109.) Velazquez identified Thomas in the courtroom as the person he questioned on April 8. 2020. (*Id.*) Thomas was transported to the interview room of the Criminal Investigations Bureau where he declined to give a statement. (*Id*. at 113.) The bags found in the shack were opened, reviewed, processed, photographed and taken into evidence and Thomas was fingerprinted, photographed and his buccal swab DNA taken. (*Id.* at 114.) Swabs were also taken from the firearms found in the recovered bags. (*Id.* at 117.)

On cross-examination, Velazquez testified that two patrol cars entered Jah Yard from one direction and two from the other direction and there were other units on Maud Proudfoot Drive. (*Id.* at 121.) Velazquez stated that it is a practice to approach the area from various angles because, for many years, every time law enforcement enters the area of Jah

Yard, individuals run. (*Id.* at 122.) He testified that he saw the three individuals run when he entered the area, but he did not run after them, and he did not see any other persons there. (*Id.* at 123.) Velazquez testified that Thomas was taken to the station because he did not have any identification on him and to ensure that he did not have any active warrants at the time. (*Id.* at 124.) Velazquez stated that he asked Thomas why he thought he had a warrant for his arrest in Georgia and Thomas said he believed that because he came to the Virgin Islands without seeking permission from his probation officer. (*Id.* at 125.) Velazquez confirmed that he conducted the protective sweep and there were no other individuals in the shack. (*Id.* at 126.) When he was asked why he did not obtain a warrant when he saw a Glock magazine in the shack, Velazquez stated he did not think the warrant was needed because it was in plain view. (*Id.* at 126-27.) Velazquez testified that he was not able to match the magazine he found in plain view to any of the four firearms found on the property. (*Id.* at 128.) The Government's Exhibits 1, 4, 5, 7, 9, 10, 11, 17 and 19, consisting of photographs, and Exhibit 21, "Receipt for Cash or Other Items," were admitted in evidence.

## II. DISCUSSION

Thomas argues that there was no probable cause to arrest him because the officers were in the area as a result of an earlier shooting, and they did not have a description of a shooter or any information that Thomas was involved in the shooting. At the time Officer Gabriel saw Thomas, Thomas was committing no crime and was simply walking on private property in the area of Hospital Ground. Upon seeing Thomas, the officers ordered him to stop and get on the ground and he complied. Thomas contends that there was also no reasonable articulable suspicion to detain him. He asserts that the officers obtained statements from him as a result of his illegal detention and any statements and physical evidence should be suppressed as fruits of the illegal detention. Moreover, the search of the shanty violated Thomas's Fourth Amendment right to privacy because he was on private property and had reasonable expectation of privacy when the officers entered the property uninvited and without consent. Thomas argues that his statements at the scene and at the police station were obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436

(1966), since he was not advised of his rights at the scene, and he was questioned at the police station after he asserted his right to remain silent.

The Government argues that the police had reasonable suspicion to detain Thomas because, when patrolling Hospital Ground, they observed three men running, leaving behind a large plastic bag and a jar containing a green-leafy substance that they recognized based on their experience to be marijuana. When the officers spoke to the persons seated in a blue truck near the contraband, the passenger said she was there to buy marijuana and that the marijuana belonged to the men who ran. At that point officers had reasonable articulable suspicion that the men who fled were involved in criminal activity. The Government contends that the officers also had probable cause to arrest Thomas because he was seen carrying a weapon in his waist band and fleeing with two black bags from an intended drug sale. According to the Government, Thomas lacks standing to challenge the search of the property because he was a trespasser and had no reasonable expectation of privacy. Alternatively, since Thomas abandoned the bags prior to his arrest, he has no standing to complain about their search and seizure, and he also denied that he had any bags. The Government argues that *Miranda* does not apply to Thomas's statements denying that he had any bags based on the public safety exception, given that he was seen running with a gun earlier, and an unsolicited statement that he did not have a gun after he was told that he was being charged with being a felon in possession of a firearm.

In the supplemental brief, Thomas argues that there is no particularized information connecting Thomas to the mason jars allegedly containing marijuana or that his actions distinguished him as an owner or purchaser of the suspected marijuana, or someone merely having a conversation in the vicinity. Since the testimony does not support a particularized reasonable suspicion that Thomas possessed the alleged marijuana in the mason jars, marijuana possession cannot be considered in a totality of the circumstances analysis. Furthermore, Thomas contends that probable cause cannot be established by the mere observation of a man with a firearm and the officers did not have information to suggest that his possession of a firearm was illegal. There are various reasons for innocent persons to run from the police, and the officers testified that they routinely patrolled this area strategically

descending on the neighborhood in a manner to restrict flight from the police. When the officers commanded Thomas to stop after observing him with what appeared to be a firearm, Thomas claims the officers had no legal basis for that order, and the information they learned later does not constitute probable cause. Both Carty and Velazquez testified that Thomas was transported to the police station to verify his identity, not because there was probable cause he had committed a crime. Thomas maintains that the public safety exception does not apply because Gabriel did not ask Thomas "where is the gun," and at the time he asked that question Gabriel did not know whether the bags contained anything that would pose a danger to the public. Thomas asserts that he has standing to challenge the search of the shanty where the bags were discovered because the statement of the person who provided the police with information about who resides at that location is not trustworthy and corroborated, and there is no evidence that Thomas did not reside there. Thomas asserts that he entered the dwelling and placed, not abandoned, the two bags he was carrying inside, "demonstrating access, dominion, and control before returning outside."

In its supplemental brief, the Government argues that Velazquez saw Thomas flee from a retaining wall where marijuana was found, and Gabriel and Carty then saw Thomas running with a gun in a high crime area, ignoring commands to stop. The officers reasonably believed that the two bags Thomas was clutching contained firearms or drugs. The Government contends that, based on the totality of the circumstances and not taking each fact in isolation, a reasonable officer could have believed that Thomas committed a crime. The question about the bags was contemporaneous with Thomas's detention and was not an interrogation since Gabriel had an objectively reasonable need to secure officer safety and the safety of the public.

## A. Reasonable Suspicion for the *Terry* Stop

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court articulated an exception to the rule that warrantless searches are presumptively unreasonable permitting a police officer to conduct an investigatory search when the officer has a reasonable suspicion that criminal activity is afoot. *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006). To justify a *Terry* stop, a police officer must have specific and articulable facts that, together with reasonable

inferences from those facts, suggest that the suspect is involved in criminal activity. *Id.* Although a person's presence in an area of criminal activity is insufficient to satisfy a reasonable, particularized suspicion that the person is committing a crime, police officers are allowed to consider the nature of a particular location in deciding whether "the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124. The Supreme Court explained that a person's refusal to cooperate with the police alone is not sufficient to justify the need for a detention or seizure, but an unprovoked flight, although not indicative of criminal activity, is sufficient to justify the police in stopping the fugitive for further investigation. *Id.* at 125.

Gabriel, Carty, and Velazquez all testified that they are familiar with the Hospital Ground area in St. Thomas, including Jah Yard, because they responded to calls of shots fired, people getting shot, drugs and illegal weapons activities in that area. Carty responded to such calls several times while Velazquez patrolled that area hundreds of times. Specifically, Carty testified that he was assigned to patrol that area on April 8, 2020, because of the homicide that occurred there the morning before, and Velazquez testified that members of the SOB were assigned to patrol that area on April 8, 2020, because of "an uptick in violent offenses in that area, specifically in the Hospital Ground, Jah Yard, area where we had shots fired," and "a week or so prior to our entering Jah Yard at that time there was a homicide." Based on the testimony of Gabriel, Carty and Velazquez, the Court finds that the area of Hospital Ground, including Jah Yard, is an area known for criminal activities, including serious and violent crimes such as homicide.

Gabriel, Carty, and Velazquez testified that, when they entered the Jah Yard area with their marked patrol cars on April 8, 2020, each observed that a group of men started to run away upon seeing the patrol cars. Velazquez's patrol car was in front of the patrol car in which Carty and Gabriel were traveling. Gabriel testified that there were four black men who started running away, one of whom was dressed in all black. Carty and Velazquez testified there were three men who started running away, one of whom was dressed in all black. Velazquez also testified that the three men were black. While the testimony about the number of men who ran away from the police on April 8, 2020, is inconsistent, each of the

police officers who testified saw only one of the persons who fled wearing all black and identified that person in court as Thomas.

Velazquez testified that, when he saw the individuals run away, he radioed that the suspects were running, and he saw, in the area from where the individuals ran, several mason-style jars sitting on the base of the fence containing green leafy substance he believed to be marijuana. Although Velazquez did not testify that he saw the mason-style jars with green leafy substance before he radioed that the suspects were running, it is a reasonable inference that he radioed after seeing the jars of marijuana because he testified that after he radioed that the suspects had run, he returned to the entrance of Jah Yard. Neither Gabriel nor Carty were asked if they heard Velazquez's radio communication, but the Court has no basis to find Velazquez's testimony incredible.

Pursuing on foot the men who fled, Gabriel and Carty decided to take a trail heading west, when they saw the men they pursued peeping to see where the officers were going. At that time, Gabriel saw the man in all black clutch the black bags. Carty identified himself as a police officer and commanded the men to stop, but they started running away, and Gabriel and Carty gave chase. It was only when they gave chase that Gabriel and Carty saw that the man in all black who was carrying the black duffle bag and backpack had what appeared to be a pistol whip in the small of his back. The next time Carty ordered Thomas to stop and get on the ground was when he saw him running toward Carty from the shanty with the open door. Carty then handcuffed Thomas. No firearms or drugs were found on Thomas's person when he was handcuffed.

The Court finds that Velazquez was justified in suspecting that criminal activity was afoot when he observed that, upon seeing the patrol cars, three men ran away from the place where Velazquez saw the mason-type jars with green leaves appearing to be marijuana. Additionally, Gabriel, Carty and Velazquez each saw that only one of the three men who ran away from the location where marijuana was observed was wearing all black. After Velazquez's radio communication, Gabriel and Carty were justified in pursuing the men who ran away, including the man in all black, who was observed by the officers to be clutching a black duffle bag and backpack and having what appeared to be a firearm in the small of his

back, and ordering them to stop in an attempt to investigate further. The totality of the circumstances, including Velazquez's observations, the fact that the area of Jah Yard is known to the police officers to be an area of criminal activity, including a homicide that occurred the morning prior to the events at issue in this case, *Ubiles*, 224 F.3d at 217 ("the fact that the stop occurred in a high crime area is a relevant contextual consideration in a *Terry* analysis"), Gabriel and Carty's observations of the man in all black running away from the police, *id.* (opining that although "headlong flight" does not indicate criminal activity, it is suggestive of wrongdoing), hiding from the police, clutching a duffle bag and a backpack and having what appeared to be a firearm in the small of his back while running away from the police and ignoring their commands to stop, indicates the existence of sufficiently specific and articulable facts and reasonable inferences as they relate to the man in all black, who is Thomas, suggesting that Thomas was involved in criminal activity. Accordingly, this conduct justified the police officers' effectuation of a *Terry* stop to investigate further. *Robertson,* 305 F.3d at 168. Although each of Thomas's acts, running away from the police, clutching a duffle bag and a backpack, and having a firearm in the small of his back, *id.* at 214 ("it is not a crime to possess a firearm in the Virgin Islands"), may not appear to be illegal when seen in isolation, the totality of the circumstances supports the Court's conclusion that the *Terry* stop in this case was valid. The valid *Terry* stop resulted in the seizure of the duffel bag and the backpack Thomas was carrying that contained illegal firearms, which, under the totality of the circumstances, supported probable cause for his arrest.

### B. Standing to Assert the Fourth Amendment Right

In order to challenge a search under the Fourth Amendment, a challenger must have standing, which requires a showing of both, an objective reasonable expectation of privacy in the searched property and a subjective expectation of privacy manifested by the challenger's conduct. *United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011). The defendant has the burden of establishing standing to challenge a search under the Fourth Amendment. *United States v. Hebron,* 243 F. Supp. 2d 90, 92 (D. Del. 2003).

Thomas argues that the search of the shanty violated his Fourth Amendment rights and he has standing to assert that right because there is no evidence that he did not reside

at the shanty where he entered and placed the two bags he was carrying. However, the burden to establish standing to assert the Fourth Amendment right is on Thomas, *Hebron,* 243 F. Supp. 2d at 92, and he cannot meet that burden by invoking the absence of the Government's evidence that he did not reside at the shanty where the warrantless search occurred. In support of his argument, Thomas relies on *Florida v. Jardines*, involving "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion," 569 U.S. 1, 6 (2013), and *Kyllo v. United States*, also involving the government's intrusion into a private home, 533 U.S. 27, 31 (2001), finding unreasonable a warrantless search of a home, but Thomas provided no evidence to establish that the shanty was his home, that he resided at the shanty, that he was a guest at the shanty, or that he was otherwise permitted to be in the shanty. Thomas also failed to provide evidence of any other basis showing that his expectation of privacy in the shanty under the circumstances was "one that society is prepared to recognize as reasonable." *Correa*, 653 F.3d at 190. The Court finds that Thomas failed to carry his burden of showing that his expectation of privacy in the shanty was objectively reasonable.

Regarding the subjective prong, Thomas's conduct did not exhibit an actual expectation of privacy because when he was running away from the police clutching the duffel bag and the backpack, he did not run from the initial place upon seeing the police directly to the shanty to retreat there and he did not retreat inside the shanty. Rather, he walked away from the shanty with the door open, leaving the duffle bag and the backpack he was carrying in plain view upon entering the shanty, which was very small according to the photographs received in evidence. These circumstances all suggests that Thomas did not intend to make private anything inside the shanty. *Id.* (noting that the objective prong asks whether the person's conduct shows that the person intended to preserve something as private). The Court finds that Thomas failed to satisfy his burden of showing that his conduct exhibited a subjective expectation of privacy in the shanty. Accordingly, Thomas has no standing to assert the Fourth Amendment right with respect to the search of the shanty.

## C. Whether Statements Were Obtained in Violation of the Fifth Amendment

*United States v. Thomas*
Case No. 3:20-cr-0039
Memorandum Opinion
Page **16** of **18**

The Fifth Amendment of the U.S. Constitution guarantees the right against self-incrimination. U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court "extended the Fifth Amendment privilege against compulsory self-incrimination to individuals subjected to custodial interrogation by the police." *New York v. Quarles*, 467 U.S. 649, 654 (1984). However, the Supreme Court carved out a narrow, so-called "public safety exception" to the *Miranda* rule based on its finding that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657.

When Carty ordered Thomas to stop and lay on the ground, Thomas complied and was handcuffed. No firearm or any contraband were found on Thomas when he was detained. When Gabriel jumped over the fence while pursuing Thomas into the shanty area where Carty stopped Thomas, he did not see any firearm. Gabriel testified that he proceeded to clear the shanty for "officer safety" because he did not know the whereabouts of the other suspects, and he asked Thomas where the bags were because he saw him with the bags when he was pursuing him. If Gabriel entered the shanty to clear it for officer safety because he did not know where the other suspects were, it is reasonable to expect that he would have asked Thomas "where are the others?" If Gabriel entered the shanty to clear it for officer safety because, at some point during his pursuit of Thomas, he saw what appeared to be a pistol, but he did not see that pistol when he jumped the fence pursuing Thomas into the shanty area, it is reasonable to expect that he would have asked Thomas "where is the pistol?" Instead, Gabriel asked Thomas where the bags were without knowing their contents. It is clear from Gabriel's testimony that he was not concerned with the whereabouts of the pistol he saw in the small of Thomas's back because he did not see the pistol when he jumped the fence of the shanty area when pursuing Thomas, he did not ask Thomas where the pistol was and he testified that he cleared the shanty for officer safety because he did not know the whereabouts of the other suspects. Although Gabriel suspected that the bags Thomas was carrying contained "either drugs or firearms," neither he nor Carty saw what was inside the bags at any time, and no officer testified that the bags Thomas was carrying posed any threat to their safety or the safety of the public for any reason at any time. The facts learned

subsequently about the content of the two bags are irrelevant to the analysis of whether the public safety exception to the Fifth Amendment right against self-incrimination applied to justify Gabriel's questioning Thomas about the bags prior to giving him his *Miranda* warnings and without knowing the content of the bags. The Court finds that the public safety exception to the Fifth Amendment does not apply under the circumstances of this case to any statements Thomas made in response to Gabriel's question "where are the bags." *Quarles*, 467 U.S. at 654. Accordingly, the Court finds that obtaining such statements in the absence of *Miranda* warnings violated Thomas's Fifth Amendment right. As such, the statements must be suppressed.

When Velazquez approached Thomas, who was on the ground and handcuffed, there was no threat to the safety of the officers or the public, as Gabriel already cleared the Shanty for officers' safety, and no firearm was found on Thomas when he was detained.[2] Velazquez testified that he asked Thomas "basic questions as to what was his name, if he had any identification on him." Velazquez then asked where Thomas came from, to which Thomas responded he came from Georgia. Velazquez asked whether Thomas had prior dealings with the law enforcement and Thomas made certain statements in response to Velazquez's questions. It is undisputed that Thomas was in custody when he made the statements in response to Velazquez's questions. Additionally, there was no threat to the officers' or to the public, and Thomas' statements were not voluntary. It is also undisputed that Thomas was not given *Miranda* warnings when Velazquez questioned him. Under the totality of the circumstances, the Court finds that Velazquez's questions constitute a custodial interrogation that occurred in the absence of *Miranda* warnings and, as such, the questioning violated Thomas' Fifth Amendment right against self-incrimination. Accordingly, under the

---

[2] While the Court finds that the public safety exception does not apply because the question "where are the bags" was not the type of question that an officer would reasonably expect was necessary to ask in order to protect the public or police, the Court is also of the opinion that the public safety exception is inapplicable because the circumstances surrounding the questioning failed to create a sufficient exigency. When Thomas was questioned, he was secured, and the shanty had already been swept and cleared the shanty. In other words, at the time of the questioning, the officers had obtained unquestioned control over the private premises thereby neutralizing the exigency. When the only risk is that the officers will stumble upon or mishandle a firearm during an encounter on a private premises, the public safety exception do apply. *See United States v. Fautz*, 812 F. Supp. 2d 570, 632 (D.N.J. 2011); *United States v. Brooks*, 358 F. Supp. 3d 440, 484 (W.D. Pa. 2018).

*United States v. Thomas*
Case No. 3:20-cr-0039
Memorandum Opinion
Page **18** of **18**

circumstances of this case, any statements Thomas made while in custody and prior to receiving the *Miranda* warning must be suppressed.

Thomas also argues in his motion that, after he was given the *Miranda* warning at the police station and asserted his Fifth Amendment rights, the police continued to interrogate him and any statements he made as a result must be suppressed. However, Thomas did not identify any questions by the police after he asserted his right to remain silent or any statements he made in response to those questions. In opposition to the motion, the Government asserted that, after Thomas invoked his right to remain silent and was informed that he was being charged with the offense of felon in possession of a firearm, Thomas made an unprovoked statement that he did not have a gun. However, during the suppression hearing, no party questioned any witnesses concerning any questions asked or statements made by Thomas after he asserted his right to remain silent. In his post-hearing supplemental brief, Thomas failed to address any post-*Miranda* statements that he generally asserted in his motion. The Court finds that Thomas abandoned his argument that any statements obtained after he asserted his right to remain silent violated his Fifth Amendment right.

## IV. CONCLUSION

For the reasons stated above, the Court will deny Thomas' motion to the extent it seeks to suppress physical evidence but will grant the motion to the extent the motion seeks to suppress Thomas's statements made prior to the *Miranda* warning. An appropriate Order follows.

**Date:** June 4, 2024                                  /s/ *Robert A. Molloy*
                                                        **ROBERT A. MOLLOY**
                                                        **Chief Judge**